# ANDI MONROE *v.* THE AMERICAN SCHOONER SALVATOR.

## June 14, 1913.

1. *Admiralty—Stowage of lumber—List of the ship—Fall of tier injuring seaman at work unloading it—Presumption:* A tier of lumber in the hold of the libellee fell from one end to the other in an unaccountable way and without warning, injuring the libelant who was engaged in unloading such tier.  According to the evidence it should not have so fallen if it had been properly stowed, unless the fall was caused by too great a list of the vessel for facilitating the unloading. *Held,* that it would not have fallen if proper care had been given to its stowage or to the listing of the ship or to both.

2. *Same—Same—Safe place to work—Responsibility—Burden of proof:* The stowage of the lumber being under the control of the owners makes them responsible; it was their duty to have it so stowed that those who were to unload it would have a safe place in which to work.  The evidence throws upon the owners the burden of showing that they used due care in loading.

3. *Same—Same—Unloading—Fellow servants:*  Those loading a vessel with lumber, are not fellow servants of those who unload the same a month later at a distant port.

4. *Same—Unloading lumber—Experience—Danger—Supervision—Negligence:* It is in evidence that less skill is required for unloading lumber than for loading it, and consequently less experienced men answer for unloading than are required for loading. *Held,* in view of this and of the fact that the careening of a vessel toward the wharf to facilitate its unloading, tends to diminish the stability of the tiers in the side of the hold opposite the wharf, that absence of supervision of the unloading by the master or an expert agent was negligence.

5. *Negligence—Custom and usage:* A negligent act cannot be justified by custom or usage.

6. *Same—Rule of res ipsa loquitur:* With the evidence of the manner of the fall of the lumber and the failure of the claimant to satisfactorily show due care in its stowage, the rule of res ipsa loquitur applies.

7. *Same—Cause of injury to libelant:* Injuries received by libelant were due to a want of due care in the loading of the libellee, and to the absence of expert supervision of unloading the same at her destination on the part of the owners and their agent.

*In Admiralty*:   Libel in rem for damages.

*George A. Davis* for libelant.
*Smith, Warren, Hemenway & Sutton* for libellee.

DOLE, J.   The libel in this case alleges, substantially, that the libelant, a seaman, regularly shipped on board the libellee at the port of Aberdeen, State of Washington, for a voyage to Honolulu and other places and back to the port of discharge in the United States, at wages of $40 a month; that the libellee having taken on board a cargo of lumber, sailed for Honolulu and upon its arrival there proceeded to the discharge of such cargo, requiring the libelant to assist in such work; which it alleges was done in a negligent, careless and improper manner, in that after the lumber in the middle of the hold, beneath and forward of the main hatch, was removed, leaving the lumber at the sides unsupported, and without employing a skilled stevedore to superintend the work of unloading, but employing unskilled persons to remove the lumber, and during such work, while libelant was engaged therein, the lumber at the side of the hold fell over upon him, without negligence or fault on his part, breaking his right leg and dislocating his left thigh and doing other injuries; and alleges such conduct, on the part of the owners, to be in violation of the shipping articles and maritime contract, and claims $5,000 damages therefor; also $200 for wages to the end of the voyage and $100 for his passage money and expenses back to Aberdeen, and $250 for care, maintenance and support, and medical attendance during his illness.

The answer of the master, as claimant, admits the shipping of the libelant as alleged; denies any further obligation on the part of the owners to the libelant, except as provided in the shipping articles or that there was any agreement that the libelant should be kept safely to the end of the voyage. It admits injury to the libelant and denies

negligence on the part of the owners or that they employed unskilled persons to unload; denies that the injury occurred without negligence on the part of the libelant; denies that the fall of the lumber was due to any negligence or lack of skill or improper conduct on the part of the master or owners in any particular as alleged or otherwise; alleges that the libelant was taken by the master to the Queen's Hospital in Honolulu and there entered as a patient of the United States public health service and received proper care and attention without charge; that the claimant is ready to transport the libelant to a port of discharge on the Pacific coast and to pay his wages during the return voyage as contemplated by the shipping articles unless libelant refuses to remain with the ship.

After the evidence was in, libelant moved to be allowed to amend the libel, in order that the pleadings might conform to the proof made and given in this suit, and to insert a new article entitled "article 4a," alleging, substantially, that it was the duty of the owners to set to work a sufficient number of men in the hold of the vessel to properly handle and discharge the lumber and to work upon the sections and tiers and portions of tiers of said lumber, yet not regarding their duties and obligations under the contract and shipping articles, placed only one workman, to-wit, this libelant, to handle a section or portion of a tier of said lumber, and while so working alone and without fault, such portion of a tier, without warning, fell over and caused the injuries aforesaid. This motion to amend is denied, on the ground that the evidence has failed to sustain the allegations of the proposed amendment.

The allegations of the libel as to negligence on the part of the master and owners in relation to the unloading of the lumber have not been proved by the evidence, except perhaps as to the want of expert superintendence; the weight of testimony, with hardly anything to the contrary, being that it was not the rule to support the tiers of lumber

at the sides of the hold after the lumber in line with the hatches had been removed, except in the case of such discharge of the cargo taking place in a seaway where the rolling of the vessel required such precaution; and also that it was not customary to have skilled stevedores superintend the work of unloading in the hold, an officer of the ship generally being on deck and attending to the portion of that part of the unloading which consisted of raising the slingloads from the hold by the donkey-engine and slinging them on to the wharf. It was generally agreed by the witnesses, with some exceptions, however, that such sailors as were obtained on the coast from the sailors' unions were competent to attend to the work of unloading without any superintendence, and were as good as, or better than, stevedores; also that there was no more danger in a man's working alone in one part of the tier of lumber, taking down pieces of lumber by himself and making them up into a slingload, than it would be to have two men working together, except in the case of long and heavy lumber, in which it would be obviously better to have a man at each end of such pieces. The witnesses all agreed that to have four or five men working together was an unknown thing and out of the question, and would be of no value and would introduce no element of greater safety; indeed, the witness Anderson testified that "it increases the danger of lots of men pulling on the tiers." Tr. 62. Although he admitted, probably referring to long and heavy pieces, that one man at each end would be less dangerous than one handling alone, and even with one man at each end and one in the middle he thought it would be less dangerous. Tr. 70. Jamieson testified "it all depends if it's big lumber or small lumber. If it's a big piece of lumber two men usually handles it sometimes, but if ordinary lumber one man handles it all the time." Tr. 143. Captain Tauser says two men would be safer than one in handling lumber in unloading where the pieces are twenty or

twenty-four feet long. Tr. 127-130. There is no evidence, however, that the men were working on long and heavy pieces when the accident occurred, but on the contrary they were handling the small pieces.

The main point in this case is to ascertain to what was due the fall of the tier of lumber which caused the injury. If it fell because of bad stowage or because of bad stowage and the act of the master in listing the vessel so far as to promote the disaster, the owners would be liable, unless the persons who stowed the lumber in Aberdeen were fellow-servants of the libelant.

The only witness who can testify to the stowing of the lumber at Aberdeen are Henry Abenth, then the second mate of the libellee, and Captain Huhs, master of the libellee, who was in the hold three or four times most every day, and Mr Speckman. Abenth says he had to look "after all the stowage below deck." Tr. 44. Upon being asked by counsel as to stowing the lumber he endeavored, not very successfully, to explain his methods, and finally to the question "How did you do the Salvator?" he replied, "I worked the Salvator the same as I done any other vessel. I can't explain any other way. In lumber business a man knows how to stow lumber; he don't work any different in this vessel or any other vessel." Tr. 48. His testimony was substantially, to load up the lower part of the hold with small and short pieces, up to within seven or eight feet from the deck beams, and upon this floor the lumber is laid in tiers on each side of the vessel from the walls toward the center line of the vessel, the tiers about twelve inches wide and running the whole length of the hold, being about seven feet high, and leaving a space about ten feet wide running fore and aft through the center of the vessel between the tiers arranged on the sides, which space is called the trunk and which space is built forward and aft of the hatches and under the hatches with smaller

lumber; and that he as second mate superintended the loading. The first tier is put on the side of the ship, a short tier, to take the "hog" out of the ship, by which I understand to take the curves out of the ship. Then a longer tier is put in next to that and another tier outside of that until the whole length of the ship is through.

M. Speckman, a witness for the libellee, was a member of the crew when the Salvator was loaded and assisted in the hold. The gist of his testimony as to building the tiers is to the effect that the first three tiers next the side of the vessel curved with the lines of the vessel and it was desirable to take out this curve, which was done by placing a 2x4 or 1x4 block or plank against the outside of the third tier against which to build the fourth tier. This he called taking the "sheer" out; after which process the rest of the tiers were straight, meaning, I take it, straight longitudinally. Tr. 133.

W. W. Jamieson, a witness for libellee, testified on cross-examination as follows:

"Q. Supposing that this placing of short lumber in between one tier and other to correct the curve should be neglected or improperly done so there is a straight tier and back of it a curved tier not filled in? A. Then we'd call that bad stowage, your Honor. Q. And would such a tier from the movement of the ship, would it be likely to be displaced? A. The one that was badly stowed? Q. Yes. A. It would be displaced if there was a space left between the tiers, naturally." Tr. 149. The following examination of Jamieson appeared on direct: "Q. Would it be possible for an inside tier to become disarranged without the disarrangement being indicated by the outside tier? A. Not in ordinary circumstances unless it was bad stowage. Q. And ordinary circumstances, why not? A. Because each tier comes right up against the next one; all the space in the hold is filled up solid." Tr. 144.

The cause of the fall of the lumber is not easy to ascertain. The attempt to prove that it was due to the manipulations of the libelant or of Olson, his fellow servant, who

was at work upon the same tier from thirty to fifty feet away from him, has, I think, failed.   True, Gunderson says that at the moment of the accident Olson was "tearing down some lumber, tried to tear it down."   Tr. 71.   He was recalled to say this after his direct and cross examinations were closed in which he said Olson "was with one foot, and a hand like this (above his head) carrying some small lumber down and he shouted 'look out'."   Tr. 40a.   He was doing what he was there to do.   There is no evidence that he was trying or intending to pull the tier down, as is sometimes done, but was taking "some small lumber down." The evidence of Captain Huhs, master of the libellee, relating to danger in unloading, i. e., "for instance start in the top tier, if you are not careful the whole tier will come down; that's where the danger lies," (Tr. 101) is not borne out by Anderson, Jamieson and Speckman.   Captain J. A. Anderson, master of the schooner Ludlow, and Captain W. W. Jamieson, master of the schooner Salem, called by the libellee, both disinterested, so far as appears, agree that if the tiers are properly stowed they cannot fall unless they are intentionally pulled to come down.   Anderson: "If the lumber is stowed right up and down, they could not fall down except you pull it."   Tr. 62.   Jamieson: "Q. Have you ever known a tier loaded in the hold of a ship to fall, or part of a tier?   A. I've never known it, your Honor, except it was thrown down by one of the men.   Q. That is, does it ever happen that a man is pulling off, that more than he is pulling off, comes off also?   A. Yes, your Honor, it happens sometimes.   Q. Is that dangerous?   A. To a certain extent it's dangerous, but the man is pulling a tier down and he sings out 'stand clear'."   Tr. 146.   M. Speckman said in answer to the following question by the court: "Q. What I want to know is for instance supposing the tier in front of it has been removed so that perhaps about three feet of it is left, then the next tier, if it fell would it fall from one end to the other or would it be a portion of it?   A. Only

a portion of it; the whole tier I never have seen that yet; never can, I don't think, because that lumber is always combined by running shorter lengths; it may be six inches or so from the tier is liable to come down if it is not watched very carefully by taking these top pieces off." Tr. 136-137.

The defense makes an ingenious argument from certain vague testimony of the libelant, construing it to mean that a plank or board projecting from the tier in front of the one that fell was partially built into such tier so that it supported a part of the weight of it and that upon Monroe's drawing it out, as he must have done as there was no one else near who could have done it, the whole tier fell. The testimony upon which this conclusion is based is as follows:

"Q. You were working alone there the same you were the others? A. She must been lying, that tier, with the plank underneath another tier a little and when we worked that a little down, that plank got loose what would hold that tier up, and when we took that tier off, that tier would fall down. Q. That is, if you took anything from off the top of the tier would make what is left fall down? A. You put a lumber, a long lumber that much underneath a tier, a lumber is underneath the block that will hold the tier steady. When we take that block out that whole tier fall down." Tr. 22-23.

This testimony is not easy of comprehension, but in any case it is clear that the defense abandoned its effort to construe it as offering, as a cause of the fall of a tier, the removal of a plank from the tier next in front, which was wedged into the tier that fell, supporting a part of its weight, for on page 29 of its brief, in arguing that the tiers were properly built up, it says: "There is no evidence that there was any room, on account of ragged or uneven edges (sides) of the tiers which would permit any dovetailing or tongued-and-groove effect between the tiers whereby one tier could work into another. The contrary is established

by the evidence that they were build solid and even."
Even if the defense is right in the construction of the above
testimony of Monroe, it would show careless construction
of the tier that fell, by allowing a part of the plank from
the tier in front of it to be so wedged in between its boards
that its removal, which would be likely to happen in deal-
ing with the front tier, would endanger its stability.

It is clear from the evidence that two precautions favor-
ing stability in building a tier are important; one is an
inward longitudinal curve toward the side of the ship, the
other is a departure from the perpendicular toward the side
of the ship; in other words the tiers should lean slightly
toward the side of the ship. Tr. 103. As to the longi-
tudinal curve or sheer, as Speckman calls it (Tr. 133), it is
reduced after several tiers are put in by pieces of lumber
placed in the curve against which the next tier is built, in
order "to get the outside tiers more straight," as Speckman
puts it. Tr. 133. At this point in the operation, he says,
"after the second mate came out, he had some authority
and he said to do so and so, and the rest of them were
straight." Tr. 134. It is not easy to gather from the evi-
dence whether or not it was the practice to retain some of
this longitudinal curve in the several tiers nearest the
middle of the ship. It looks to the court as if such a prac-
tice would be important as a measure of safety.

As to the inclination of the tiers toward the side of the
ship there is no evidence outside of that of Captain Huhs,
master of the libellee, who says, referring to the tiers on
the libellee, "they're been put in straight and only lean a
little but so they can't come down." Tr. 103. And
Abenth, the mate, who refers to "the lumber being pushed
over against the side of the ship leaning to the side," (Tr.
78) and yet says (Tr. 91), referring to the first tier, "it's
supposed to be straight up and down, that tier and the
next tier outside of that again. The master's assurance
that the work was properly done is based on the fact that

he had the second mate, "a good man" to superintend the stowing, and that he himself was down in the hold most every day three or four times. It is in evidence that the second mate came aboard on one occasion when Speckman was taking out the sheer, and took command of stowing operations. From this it would appear that he was not in the hold all the time.

There does not appear to be any testimony, except that of Captain Huhs, that would give the impression that after the sheer in the tiers is taken out as described by Speckman, the remaining tiers toward the middle of the vessel, which would include the one that fell, had any inclination toward the ship's side, but on the contrary they are repeatedly referred to as being straight up and down. If they were straight up and down, a list of the ship toward the wharf would tend to produce a condition of unstable equilibrium in those tiers in the side of the vessel opposite to the wharf. Monroe says, "the ship was leaning over and them tiers was leaning over," (Tr. 21) adding if the lumber had been properly stowed the list would not have caused it to fall.

Jamieson testified in regard to the possible effect of the list of a vessel in unloading:

"Q. With such a list and unloading the starboard side, with the port side toward the wharf, would that list tend to weaken the stability of the tier which had the tier in front of it removed? A. It would if it was a big list; it might weaken the tier because it is more liable to drop down. Q. Have you ever known that to happen? A. Not to my own experience on my own vesels." Tr. 121.

[1] The tier fell in a most unaccountable way from one end to the other without warning and without an apparent cause. It ought not to have so fallen according to disinterested and experienced witnesses if it had been properly stowed, unless the fall might have been brought about by

too great a list of the ship.    In such a case the presumption is that it would not have occurred if proper care had been given to its stowage or to the listing of the ship or both.    *Griffin v. Manice,* 166 N. Y. 188, 192.

"The fact of the casualty and the attendant circumstances themselves furnish all the proof of negligence that the injured person is able to offer, or that it is necessary to offer."    Shearman and Redfield on Negligence, sec. 59, quoted in *Griffin v. Manice,* supra, 192.

[2]  The stowing of the lumber was under the control of the owners.    This is the test of responsibility.    It was their duty to have the lumber so stowed that their employees whose place it might be to unload would have a reasonably safe place in which to work.    With the evidence in the case the burden is thrown upon the owners of showing that they used due care in the loading of the libellee.

[3]  Counsel for libellee argue that if there was negligence in the stowing it was the negligence of a fellow servant for which the owners were not liable.    Is it not pressing the doctrine of fellow servants rather far to say that men loading a vessel are fellow servants of the men who unload it a month later and two or three thousand miles away?

"Two persons may, indeed, work under the same master and receive their pay from the same source; but this is not sufficient.    They must be at the time engaged in a common purpose or employed in the same general business."    *Northern Pacific R. R. v. Herbert,* 116 U. S. 642, 651.

The duty which the master owes to his servant, of providing him reasonably safe surroundings in which to work, he cannot delegate to an agent and thus free himself from responsibility.

"He is liable for the neglect of that other, which, in such

case is not the neglect of a fellow servant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform as such." *Northern Pacific R. R. v. Peterson,* 162 U. S. 346, 353.

[4] The allegation of negligence on the ground of the absence of skilled superintendence of the work of unloading remains to be considered. It is in evidence that skill acquired from experience is necessary for the work of stowing lumber on board a vessel and that comparatively little skill and experience are required for unloading. And although the prevailing testimony is to the effect that expert superintendence of the operations of unloading lumber in the hold is unnecessary and not customary, yet there is evidence which tends to shake one's confidence in the prevailing practice of not furnishing such superintendence, or giving that protection to the workers that the situation seems to require. Anderson says there is no more danger to the men in the hold in unloading than in other work, "the only thing you have to see what's going on;" (Tr. 58) also that in unloading lumber in the harbor of San Francisco he superintended such unloading himself. Tr. 60-61. Tauser says, "the degree of safety would be increased by reason of the fact of having a stevedore superintending the unloading of the cargo," although he added he didn't think it necessary. Tr. 128. Here is the situation. Tiers of lumber 12 inches wide are built up 6 to 8 feet high and perpendicular. The vessel in discharging is careened toward the wharf to facilitate the slinging of the lumber to the wharf. This obviously tends to create a condition of unstable equilibrium in the tiers in the side of the vessel opposite the wharf. The experience of men unloading is not required to be as great as of those who load. In other words, men who would not be satisfactory for loading a ship, answer for the work of unloading. The experienced

man who understands the requirements and methods of loading lumber would probably be able to detect a dangerous condition of a tier of lumber such as one of unstable equilibrium or being ready to fall, while the man unused to loading lumber would be likely to fail to notice it.

Under the circumstances of unloading operations in general, and the circumstances of this case as shown by the evidence, it appears to me that some supervision by the master or an expert agent, of the stability of the tiers of lumber as they are severally exposed by the partial removal of the tier next to them, is called for in relation to the safety of the men at work taking down such tiers, and the absence of such supervision is negligence on the part of the owners and their agents.

[5] "A negligent act, clearly shown to be such, cannot be justified on the ground of custom or usage." 6 Thompson's Commentaries on Negligence, sec. 7882.

The attempt to defend an act from the charge of negligence by evidence that the practice of similar methods is customary is, if the act complained of is negligent, "in effect, an offer to show, as an excuse for its negligence, a custom of others to be equally negligent." *Cleveland v. N. J. Steamboat Co.,* 5 Hun. 523, 529.

Under these circumstances I find:

[6] *First,* that the manner of the fall of the tier of lumber whereby libelant was injured and the circumstances connected with it, and the principles and methods involved in the loading and unloading of lumber, bring the case within the rule of res ipsa loquitur, and the claimant has failed satisfactorily to show due care in the loading of such lumber.

[7a] *Second,* the owners and their agents are shown to have been guilty of negligence, in their failure to have expert inspection of the tiers of lumber in the hold as to their stability as they were severally exposed by the partial removal of the tiers next outside of them respectively.

[7b] *Third,* the injuries received by the libelant by the fall of lumber in the hold of the Salvator on January 2, 1913, were due to a want of due care in the loading of the Salvator at the port of Aberdeen, and to the absence of expert supervision of the work of unloading the same in the port of Honolulu on the part of the owners and their agents.

As to the injuries received by the libelant, there is no serious conflict in the testimony. His leg was broken below the knee and his hip dislocated; there were other minor injuries, causing doubtless some pain.

The claim for wages has been settled as appears by stipulation filed herein. The claim for care, maintenance and support and for medical attendance for and during the illness of the libelant, is affected by the fact that the claimant entered the libelant immediately after his accident in the Queen's Hospital at Honolulu as a patient of the United States public health service, and that he thereafter received the necessary medical care and attendance without charge or expense to himself. The two medical witnesses agreed that he would be disqualified for seaman's work for four or five months. The balance of whatever the libelant is entitled to under his claim for passage money back to the port of Aberdeen, is included in the award herein made, which for such claim and his claim for damages on account of his injuries, is fixed at one thousand dollars. Decree will be entered for that amount in favor of the libelant, with costs.